**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **CHRISTOPHER PHILLIPS,** | : |
| **Administrator for the** | : |
| **ESTATE OF KAREN CATO** | : |
| **PLAINTIFF,** | : |
| | : **CIVIL ACTION NO. 3:11cv1752 (VLB)** |
| | : |
| **v.** | : **AUGUST 17, 2012** |
| | : |
| **GENERATIONS FAMILY HEALTH** | : |
| **CENTER,** | : |
| **DEFENDANT** | : |

<u>**MEMORANDUM OF DECISION GRANTING DEFENDANT'S [DKT. #12] MOTION TO**</u>
<u>**DISMISS PLAINTIFF'S COMPLAINT**</u>

The Defendant, Generations Family Health Center ("Generations"), moves

pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss the complaint filed by Plaintiff,

Christopher Phillips, M.D. ("Dr. Phillips") as administrator for the estate of Karen

Cato on the basis that Plaintiff failed to exhaust administrative remedies under

the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* ("FTCA").  Plaintiff brings

this action against Generations alleging medical malpractice in connection with

the treatment of the decedent Karen Cato.  Plaintiff concedes that he failed to file

the required administrative claim but argues that this Court should dismiss this

action without prejudice to leave to file the claim on the basis of the "savings

clause" of the FTCA or the application of equitable tolling.  For the foregoing

reasons, the Court finds that Plaintiff is not entitled to equitable tolling and that

the saving clause is not applicable to the instant case.  The Court therefore

GRANTS Defendant's motion to dismiss without leave to file an administrative claim.

### Procedural Background

On March 31, 2011, Plaintiff petitioned the Connecticut Superior Court pursuant to Conn. Gen. Stat. §52-190a(b) for an extension of the statute of limitations for "90 days to allow reasonable inquiry into the grounds for pursuing a legal action against one of more of the following: Uzma Zaidi, MD, John Bodin, MD, Generations Health Center, Inc. and/or its agents, servants or employees…" [Dkt. #22, Ex. A].  The Petition indicated that the "Statute of Limitations has not yet run; the acts or omissions, which may give rise to a claim(s) occurred on or about April 6, 2009.  Any action or actions that may be brought by Christopher Phillips, MD, Administrator of the Estate of Karen Cato will be filed in this Court." *Id.*  The Connecticut Superior Court granted the extension that same day.  *Id.*

On June 30, 2011, the Plaintiff filed a complaint against Generations in Connecticut Superior Court.  *See* [Dkt. #1].  The United States Attorney's Office removed the Superior Court action to this Court on the grounds that the treatment provided by Generations fell within the purview of the FTCA pursuant to the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233(g)-(n).  *Id.*  The basis for removal is that during the relevant time period, Generations was deemed by the Department of Health and Human Services ("HHS") to be a Public Health Service facility whose employees are entitled to malpractice coverage under the FTCA.   On this basis, the claims against Generations are really claims

against the United States of America and therefore Plaintiff's state law tort claims
are subject to the FTCA.

   Factual Background

      The following facts are based on the Plaintiff's complaint and
memorandum in opposition to Defendant's motion to dismiss.  Ms. Karen Cato
(the "Decedent") was treated at Generations in Norwich, CT by Dr. Uzma Zaidi, Dr.
Jyothirmayee Korivi, and APRN Tara Menichetti on several occasions from
October 1999 through January 2009. [Dkt #1, Complaint, ¶¶ 1-11].   Plaintiff
alleges that Defendant failed to timely diagnose and treat the Decedents' colon
cancer.  Plaintiff further alleges that Defendant failed to order or prescribe a
"screening colonoscopy for this patient in light of the patient's age, close family
history of colon cancer, history of irritable bowel syndrome, blood in the stool
and internal hemorrhoids, at office visits from September 17, 2007 until December
11, 2008." *Id.* at ¶12.   Plaintiff alleges that Defendant failed to screen for blood in
the stool and conduct a simple rectal exam at office visits from September 17,
2007 until December 11, 2008. *Id.*  The Decedent passed away on April 6, 2009 of
advanced colon cancer.

      In January of 2009, prior to her death, Decedent consulted with Gerhardt M.
Nielsen a lawyer with the law firm of Pegalis & Erikson, LLC ("Pegalis") regarding
her diagnosis of advanced colon cancer.  [Dkt #22, Ex. C ¶¶ 3-4].   Attorney
Nielsen indicated that he told the Decedent that "only after a review of her
medical records by an expert would it be possible to advise if there was any

reason to suspect that a physician did anything harmful to her" and that "in cases involving young people like her, it was very unlikely that any negligence of a doctor would have contributed to her injury because, in general, the standard of car for patient in her age did not require routine colon cancer screening." *Id.* at ¶5.  Attorney Nielsen sent a medical records request to Generations within a week of meeting with the Decedent in January of 2009 and told the Decedent that once the records were received he would have them reviewed by a medical expert. *Id.* at ¶6.

Shortly following Decedent's death, the Plaintiff, Decedent's brother Dr. Christopher Phillips M.D., called Attorney Nielsen and informed him of her death. Dr. Phillips also indicated in this communication that the Decedent's son, Zane Deshong, would be in touch with Attorney Nielsen.  *Id.* at ¶7.  Dr. Phillips attests, in an affidavit, that he knew that the Decedent had spoken with lawyers at Pegalis prior to her death.  [Dkt. #22, Ex. B., ¶5].  Although the parties do not give the exact date that Dr. Phillips contacted Attorney Nielsen it is clear this communication occurred by April 27, 2009 as Attorney Nielsen attests that he was unable to review the medical records he received on April 27, 2009 as he "had no authority from any source to look at them as they were protected medical records."  [Dkt. #22, Ex. C, ¶9].  The Court therefore assumes that April 27, 2009 is the date on which Dr. Phillips communicated to Attorney Nielsen regarding the Decedent's death.

On July 6, 2009, Attorney Nielsen received the promised phone call from Decedent's son, Mr. Deshong.   Mr. Deshong informed Attorney Nielsen that he

was "in the United States Navy on submarine duty in the Pacific, and he specifically cautioned [Attorney Nielsen] that he would be very hard to contact because he would be on tour for months at a time." *Id.* Attorney Nielsen told Mr. Deshong that his law firm Pegalis did not have all of Decedent's medical records and had not reviewed what records they had received because they did not represent Mr. Deshong or his mother's estate. *Id.* at ¶10. Attorney Neilson encouraged Mr. Deshong to have someone appointed as administrator of his mother's estate so that someone could authorize Pegalis to investigate. *Id.* Mr. Deshong indicated that he did not object to Pegalis reviewing what records they had received. *Id.* at ¶11.

Attorney Nielsen indicated that "[a]lthough, over the next eight months, we attempted to work with [Mr. Deshong] to attend to legal details, including … the establishment of an estate, this became impractical." *Id.* at ¶13. In March of 2010, Mr. Deshong advised Attorney Nielsen that he was sending his contact information to his uncle Dr. Phillips and that his uncle "would take care of the situation from that point forward" and would be in touch soon. *Id.* at ¶14.

In July of 2010, Attorney Nielsen was contacted by Dr. Phillips who authorized Pegalis to review the Decedent's medical records. *Id.* at ¶¶15-16. Attorney Nielsen put Dr. Phillips in touch with the DeAngelo firm a Connecticut law firm and advised him that DeAngelo would be working with Pegalis on this matter. *Id.* at ¶17. "After July of 2010, Dr. Phillips was put in contact with Mr. DeAngelo's office for the purpose of having him appointed as the administrator of his sister's estate." *Id.* at ¶19.

Attorney Nielsen sent the medical records they had received to Dr. Apstein, an internist and gastroenterologist to review. *Id.* at ¶20.  In December 2010, Dr. Apstein indicated that he had reviewed the available medical records but that he would prefer to review the complete record before giving his opinion. *Id.* at ¶17-21.  As of December 2010, Attorney Nielsen had not been able to request Decedent's medical records from Lawrence & Memorial as a result of the delay in appointing an administrator of the Decedent's estate. *Id.*  On March 21, 2011, Dr. Phillips was appointed as administrator of the Decedent's estate by the Probate court. *Id.* at ¶2.

Attorney Nielsen attests, in an affidavit, that "review of the Generations records did not reveal anything which in any way indicated that Generations, or any of the doctors there, were federal 'Public Health Service Employees' or subject to the provisions of the Federal Tort Claims Act.  Ms. Cato was not a service patient.  She had medical insurance with Aetna.  She was not homeless and was not on public assistance." *Id.* at ¶25.   Attorney Nielsen further attests that the "website for Generations did not contain any information indicating that this was a federally funded facility; nowhere on the site did it indicate that there was any federally funding involved." *Id.* at ¶26.

## Legal Standard

The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are "substantively identical." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d. Cir.

2003).  However, on a motion to dismiss under Rule 12(b)(1), the party invoking the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6).  *Id.*  In deciding both types of motions, the Court "must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff."  *In re AIG Advisor Group Sec. Litig.*, 309 Fed. App'x. 495, 497 (2d Cir. 2009).  "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

The Court's review on a motion to dismiss pursuant to Rule 12(b)(6) is generally limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).  In addition, the Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).  In deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), however, the Court "may resolve disputed factual issues by reference to

evidence outside the pleadings, including affidavits." *State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 n.4 (2d Cir. 2007).

<u>Analysis</u>

The FTCA requires that a claimant exhaust all administrative remedies before filing an action in federal court. *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F. 3d 76, 82 (2d Cir. 2005). This administrative exhaustion requirement is jurisdictional. *Id*. If the claimant does not exhaust his/her administrative remedies, a federal court will not have subject matter jurisdiction over the action. To survive a Rule 12(b)(1) motion, Plaintiff must prove by a preponderance of the evidence that the Court has subject matter jurisdiction over his claim. *Lunney v. United States*, 319 F. 3d 550, 554 (2d Cir. 2003). Here, Defendant argues that this Court lacks subject matter jurisdiction over Plaintiff's claim because Plaintiff did not file a timely administrative claim with HHS within two years of the date that his claim accrued.

Plaintiff concedes that he failed to file an administrative claim but argues that he should now be permitted to do so for two reasons. First Plaintiff argues that his claim is timely as it should be subject to the savings clause in 28 U.S.C. § 2679 (d) (5) on the basis of his March 31 Superior Court Petition. Plaintiff argues the state court action was commenced for purposes of the savings clause within two years of the Decedent's death when he filed the March 31, 2011 Petition seeking an extension of the state statute of limitations. Second, Plaintiff argues in the alternative that his medical mal-practice claim did not "accrue" for FTCA purposes until at earliest Mid July 2009 when the Decedent's son first contacted

Pegalis and when Pegalis first received the Decedent's medical records and therefore his claim is timely and on this basis also subject to the savings clause. Lastly, Plaintiff argues in the alternative that he is entitled to the protection of the doctrine of equitable tolling.  The Court will examine each of Plaintiff's argument in turn.

> i.    Savings Clause under 28 U.S.C. § 2679(d)(5) on the basis of the March 31, 2011 Petition

Plaintiff argues that his action is timely by virtue of the so-called savings clause of 28 U.S.C. § 2679(d)(5) which provides in relevant part that "[w]henever an action or proceeding in which the United States is substituted as the party defendant under this subsection is dismissed for failure to first present a claim pursuant to section 2675(a) of this title, such claim shall be deemed to be timely presented under section 2401(b) of this title if (A) the claim would have been timely had it been filed on the date the underlying civil action was commenced, and (B) the claim is presented to the appropriate Federal agency within 60 days after dismissal of the civil action."  28 U.S.C. § 2679(d)(5).  Plaintiff argues without citation to any caselaw that this action "was commenced within the time allowed for FTCA claims because the plaintiff filed the March 31 Petition to extend the statute of limitations with the appropriate clerk of the state court less than two years after Karen Cato's death, effectively initiating the claims."  [Dkt. #22, p. 5-8]. In other words, Plaintiff argues that he commenced the lawsuit upon filing the March 31 Petition to extend the state statute of limitations.  Plaintiff therefore contends that on the basis of the savings clause this Court should dismiss the action with leave to file a claim to HHS within 60 days of dismissal.

Defendant argues that although Conn. Gen. Stat. § 52-190a(b) may extend the statute limitations period under Connecticut law, it does not apply under the FTCA because only "[f]ederal law determines the date that an FTCA claim accrues." *A.Q.C. ex re. Castillo v. U.S.*, 656 F.3d 135, 139 (2d Cir. 2011). Defendant further argues that the civil action was not commenced on the filing of the March 31, 2011 Petition but instead untimely commenced when the complaint was filed on June 30, 2011 which was more than two years after Plaintiff's FTCA claim accrued on April 6, 2009 when the Decedent passed away.

Pursuant to federal law, an action is commenced by filing a complaint with the court. *See* Fed. R. Civ. P. 3. The United States Supreme Court has held that under the *Erie* doctrine Federal Rule of Civil Procedure 3 "governs the date from which various timing requirements of the Federal Rules begin to run, but does not affect state statutes of limitations." *Walker v. Armco Steel Corp.*, 446 U.S. 740, 751 (1980). In the instant case, federal law governs as the FTCA's two year limitations period is one relating to a timing requirement under federal law and not a state statute of limitation. Consequently, under Federal Rule of Civil Procedure 3, the March 31 Petition did not commence the action as no complaint was filed.

Moreover, a plain reading of Plaintiff's March 31 Petition buttresses this conclusion as the Petition indicates that Plaintiff was engaged in a "reasonable inquiry into the grounds for pursuing a legal action against" various potential defendants and states that "[a]ny action or actions that *may be brought* by Christopher Phillips, MD, Administrator of the Estate of Karen Cato *will be filed* in

[Superior] Court."  [Dkt. #22, Ex. A] (emphasis added).  Further, the text of Conn. Gen. Stat. § 52-190a[1] underscores that the effect of the Petition is to allow a claimant the ability to bring an action later should he chose to do so.  Conn. Gen. Stat. § 52-190a provides that a ninety-day extension of the statute of limitations shall be granted "upon petition to the clerk of the court where the civil action *will be filed.*" Conn. Gen. Stat. § 52-190a (emphasis added).   The Petition itself and the text of Conn. Gen. Stat. § 52-190a plainly indicate that the filing of the Petition did not commence an action against the Defendants.  Indeed, under Conn. Gen. Stat. § 52-190a if a claimant failed to file an action within the 90 day extended period or failed to obtain and file the required written opinion, the action would be subject to dismissal.  At most, the Petition under Conn. Gen. Stat. § 52-190a merely extended the time to commence an action as opposed to actually commencing the action.  Plaintiff's argument that the action is timely under the savings clause as a result of his March 31 Petition is therefore unavailing.  Consequently, Plaintiff's claim is not subject to the savings clause on this basis.

ii.    Date of accrual of medical malpractice claim

---

[1] **Conn. Gen. Stat. § 52-190a provides that in order to file an action within the requested ninety-day extension the "complaint, initial pleading or apportionment complaint shall contain a certificate of the attorney or party filing the action or apportionment complaint that such reasonable inquiry gave rise to a good faith belief that grounds exist for an action against each named defendant or for an apportionment complaint against each named apportionment defendant… To show the existence of such good faith, the claimant or the claimant's attorney, and any apportionment complainant or the apportionment complainant's attorney, shall obtain a written and signed opinion of a similar health care provider." *Id.*

Plaintiff argues in the alternative that his medical malpractice claim did not "accrue" for FTCA purposes until at earliest Mid July 2009 and is therefore timely brought and also subject to the savings clause.  Plaintiff contends that the "wrongful death claim asserted by Dr. Phillips on behalf of the Estate of Karen Cato did not 'accrue' on the date of Karen's death, but at a later time" and argues that "the very earliest the wrongful death claim could have accrued was in Mid July, 2009, when the decedent's son, Zane Deshong, was first in contact with counsel and when records concerning her cancer were first received."  [Dkt. #22, p. 9].  Defendant argues that the claim accrued by April 6, 2011 the date the Decedent passed away as it is clear that by that date the Decedent's family held enough information to protect themselves by seeking legal advice by virtue of the fact that the Decedent had already consulted with Pegalis regarding a potential medical malpractice claim shortly before her death.

"Federal law determines the date that an FTCA claim accrues."  *A.Q.C.*, 656 F.3d at 139.  "Typically, FTCA medical malpractice claims accrue 'at the time of injury.'"  *Id.* (quoting *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998)).  "However, where a plaintiff would reasonably have had difficulty discerning the fact or cause of injury at the time it was inflicted, the so-called 'diligence-discovery rule of accrual applies.  The diligence-discovery rule sets the accrual date at the time when, "with reasonable diligence," the plaintiff "has or ... should have discovered the critical facts of both his injury and its cause" *Id.* (internal quotation marks and citation omitted).  The Second Circuit has indicated that this "is not an exacting requirement, but requires only knowledge of, or knowledge

12

that could lead to, the basic facts of the injury, i.e., knowledge of the injury's existence and knowledge of its cause or of the person or entity that inflicted it.... [A] plaintiff need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim.  Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice."  *Kronisch*, 150 F.3d at 121 (citation omitted).

The Second Circuit has explained that once an injured party or the injured party's guardian "knows enough to warrant consultation with counsel, and acts with diligence to undertakes such consultation, conscientious counsel will have ample time to protect the client's interest by investigating the case and determining whether, when, where, and against whom to bring suit.  The diligent-discovery rule protects plaintiffs who are either experiencing the latent effects of a previously unknown injury or struggling to uncover the underlying cause of their injuries from having their claims time-barred before they could reasonably be expected to bring suit; at the same time, the rule avoids unduly extending the limitations period for those who could have timely presented their claim to DHHS had they acted diligently in protecting their interests."  *A.Q.C.*, 656 F.3d at 140.

Here the "critical facts" of the Decedent's injury were readily discernable at the latest by April 27, 2009[2] the date at which the Plaintiff, Dr. Phillips, contacted

_____

[2] As discussed above, although the parties do not provide the actual date of the communication between Dr. Phillips and Attorney Nielsen, the Court assumes it occurred by April 27, 2009 based on Attorney Nielsen's statement in his affidavit that he could not review medical records received on April 27, 2009 in light of the

Attorney Nielsen to inform him of the Decedent's death and apprise him that the Decedent's son, Mr. Deshong, would be in touch to discuss the Decedent's potential claim.  It is clear then that by April 27, 2009 both Dr. Phillips and Mr. Deshong were aware that the Decedent had consulted with Pegalis regarding a potential medical malpractice claim prior to her death and therefore they both had reason to suspect that Decedent's injury was iatrogenic (that is, caused by her doctor) as of that date.  Moreover it is clear that Mr. Deshong was seeking Pegalis's legal advice on April 27, 2009 when Dr. Phillips informed Attorney Nielsen that Mr. Deshong would contact him about his mother's potential malpractice claim.  The fact that Mr. Deshong only got in touch with Pegalis several months later on July 6, 2009 to formally follow up on his mother's potential claim is not dispositive because by April 27, 2009 Mr. Deshung[3] was aware of his mother's prior consultation in which she suspected she had suffered an iatrogenic injury and had agreed that he would follow up with Attorney Nielsen.   Therefore by April 27, 2009, both Dr. Phillips and Mr. Deshong knew or should have known enough of the critical facts of the Decedent's injury and causation to protect themselves by seeking legal advice.

Indeed, the Second Circuit has held that "medical malpractice claims brought under the FTCA can, and often will, accrue *before* a plaintiff actually retains counsel and before counsel requests, let alone receives, the relevant medical records… That a medical malpractice claim will often accrue before

fact that he had been informed of the Decedent's passing and had no authority to look into those records at that time.

[3] The Court notes that Plaintiff does not raise any arguments based on the Soldiers' and Sailors' Civil Relief Act of 1940.

counsel is retained makes perfect sense. An accrual date that turns on when a plaintiff (or his lawyers) finally decides to take action, rather than when the plaintiff was sufficiently alerted to the appropriateness of seeking legal advice, would render the limitations period meaningless." *A.Q.C.*, 656 F.3d at 141 (emphasis in the original).  The Second Circuit's logic soundly refutes Plaintiff's argument that the accrual date should be July 6, 2009 when Mr. Deshong got in contact with Attorney Nielsen as it is clear that by April 27, 2009 Mr. Deshong was sufficiently alerted to the appropriateness of seeking legal advice when his uncle, Dr. Phillips, called Attorney Nielsen and informed him that Mr. Deshong would be in touch regarding his mother's potential claim.  July 6, 2009 is really the date when Mr. Deshong finally decided to take action and not the date when he was sufficiently alerted to the appropriateness of seeking legal advice.   As the Second Circuit unequivocally held, to credit the July 9, 2009 date in the instant case would risk rendering the limitations period meaningless.   Here there is no question that both Mr. Deshong and Dr. Phillips were sufficiently alerted to the appropriateness of seeking legal advice by April 27, 2009.

The Second Circuit has emphasized that the "key, again, is identifying the time by which the plaintiff is told of or had reason to suspect that the injury suffered related in some way to the medical treatment ... received." *Id.* at 143 (internal quotation marks and citation omitted).  Here, by April 26, 2009 it is clear that both Dr. Phillips and Mr. Deshong were aware that the Decedent had consulted Pegalis because she suspected that the injury suffered related in some way to the medical treatment she had received.  Therefore the Decedent's actions

in consulting Pegalis put Dr. Phillips and Mr. Deshong on notice that the Decedent might have suffered a potentially iatrogenic injury.  Therefore as of April 27, 2009, Dr. Phillips and Mr. Deshong were aware of the need to inquire further to protect their rights.  As the Second Circuit explained in *A.Q.C.*, from that point onward, Dr. Phillips, Mr. Deshong, and Pegalis "had ample time to investigate the case and determine whether, against whom, and in what forum to bring a malpractice action."  *Id.*  The Second Circuit found that such a "conclusion thus gives ample protection to plaintiffs who cannot be expected to assess the potential for an action themselves… [and] it provides no cover for temporizing plaintiffs or dilatory attorneys.  If the cause of action did not accrue until the attorneys obtained and reviewed the medical records, even had [plaintiff] waited three, four, or ten years before retaining counsel, or had the firm waited a similarly long time before beginning its investigation, that inaction would not have prevented this claim from accruing."  *Id.*  Since the Court finds that the FTCA claim accrued on April 27, 2009, the Plaintiff's June 30, 2011 complaint was therefore untimely made and cannot be "saved" under 28 U.S.C. § 2679(d)(5).

  iii.  **Equitable tolling**

   Plaintiff argues that equitable tolling should apply to the FTCA's two year limitations period in this case as Plaintiff and his counsel acted with due diligence in pursuing the claim by filing the March 31 Petition and despite such diligence were unable to discover that Generations  was covered by the FTCA. Defendant argues that equitable tolling is not available in an action brought under the FTCA and that in the event that equitable tolling is available Plaintiff cannot

establish either an extraordinary circumstance or the due diligence necessary to justify application of equitable tolling.   The question of whether equitable tolling is even available in medical malpractice claims brought pursuant to the FTCA is an open question in the Second Circuit.   *See A.Q.C.*, 656 F.3d at 144 n6.   However, this Court need not resolve this issue because the doctrine is inapplicable to the facts of the instant case.

"Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo,* 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005). "Because statutes of limitations protect important social interests in certainty, accuracy, and repose, equitable tolling is considered a drastic remedy applicable only in rare and exceptional circumstances" *A.Q.C.*, 656 F.3d at 144 (internal quotation marks, citations and alteration omitted).   The Second Circuit "has applied the doctrine as a matter of fairness where a plaintiff has been prevented in some extraordinary way from exercising his rights, or has asserted his rights in the wrong forum." *Johnson v. Nyack Hosp.,* 86 F.3d 8, 12 (2d Cir.1996) (internal quotation marks and alterations omitted).

Plaintiff argues that he is entitled to equitable tolling because he timely asserted his rights in the wrong forum and exercised the required due diligence. Plaintiff argues that the Decedent's family diligently pursued the claim and that both New York and Connecticut counsel coordinated a continued investigation and evaluation of the claim working with a medical expert.   [Dkt. #22, p.28].

17

Plaintiff argues that his counsel exercised due diligence by reviewing the medical records from Generations, the Generations website, investigating the corporate status of Generations, and preparing the March 31 2011 Petition to extend the state statute of limitations in Superior Court.  *Id.*   Plaintiff further argues that their investigation "revealed no clue that Generations was 'covered' by the FTCA. *Id.* at 21-22.  Plaintiff maintains that there was nothing in the Generations medical records to indicate that it was a Public Health provider under federal law or that it was subject to the FTCA.  *Id.* at 21-22.  Lastly, Plaintiff argues that the Generations website contained ambiguous and misleading information as to whether it received federal funding or not.  *Id.*

Plaintiff argues that the Third Circuit's decision in *Santos ex rel. v. U.S.*, 559 F.3d 189 (3d Cir. 2009) supports a conclusion that the Plaintiff was pursuing his rights diligently to warrant application of equitable tolling.  In *Santos*, the Third Circuit concluded that equitable tolling was warranted where medical malpractice claim, initially filed as state suit by counsel who otherwise diligently pursued the claim but failed to timely determine that the Defendant health care providers were deemed to be federal employees subject to the FTCA.  The Third Circuit concluded that the plaintiff exercised due diligence because the facility "apparently looked like a private clinic, and except for FTCA purposes the clinic and its employees were private actors," counsel corresponded with the facility, obtained medical records, visited the facility and retained several expert records. The Third Circuit reasoned that "[n]one of these inquiries, records, or visits, or correspondence gave him a clue that the healthcare providers … were deemed

18

federal employees or that Santos could contact the Department of Human and Health Services for more information about them."  *Id.* at 200.   The Third Circuit concluded that counsel's assumption that the doctors were private actors subject to state law was therefore not an unreasonable one.  *Id.* at 201.

However, the facts and circumstances of the instant case are more similar to the Second Circuit's recent holding in *A.Q.C.* on this same issue than the Third Circuit's holding in *Santos*.  In *A.Q.C.*, the Second Circuit held that the Plaintiff's counsel's dilatory response prevented the application of equitable tolling assuming arguendo that such tolling applied to actions brought under the FTCA. The Second Circuit concluded "that retained counsel, despite having the information necessary to ascertain the proper defendants shortly after their retention, merely conducted three periodic, internal reviews over the following year-and-a-half to determine whether the case should move forward."  656 F.3d. at 144.  The Second Circuit explained that "[i]t is fundamental that a lawyer investigating a possible claim on behalf of a client needs to investigate not only whether a potential claim exists in the abstract, but also who would be the appropriate parties to sue, and what, if any, restrictions on the time and forum for bringing such a claim might exist."  *Id.* at 145.  The Second Circuit noted that the firm Fitzgerald & Fitzgerald, "which advertises itself as a 'top firm in the medical malpractice field,' had previous experience with this very issue" and reasoned that "[i]t is hard to understand why any lawyer – let alone a lawyer at a firm specializing in medical malpractice with specific prior acquaintance with this issue – would not investigate the federal nature of potential defendants as part of

standard due diligence in every medical malpractice case.  Having neglected to take that simple step, the Firm cannot now argue that it diligently pursued this claim on A.Q.C.'s behalf."  *Id.*  In the present case, Pegalis, like Fitzgerald & Fitzgerald, advertises itself as "[r]ecognized by the legal community as a Top Tier medical malpractice firm" and therefore should have known to investigate the federal nature of a potential defendant as part of its standard due diligence.  *See* http://www.pegalisanderickson.com/ (last visited August 14, 2012).

The Second Circuit in *A.Q.C.* also concluded that "no extraordinary obstacle prevented the Firm from identifying Dr. Castillo's federal status (and therefore the particular requirements for filing suit under the FTCA) in a timely way.  Even the most cursory investigation would have revealed the federal nature of A.Q.C.'s claim. To determine that status, all the Firm had to do was either call a government-sponsored toll-free number or enter 'Urban Health Plan' into the online database maintained by the Health Resources and Services Administration, an agency within DHHS.  Had the Firm taken either of those steps within the first twenty-two months of its relationship with Ms. Castillo, it would have learned—just as it did in February 2008 when it belatedly chose to make precisely that inquiry—that A.Q.C.'s claim was covered by the FTCA.  As a result, the Firm cannot now claim that the federal nature of this action was somehow hidden from view." 656 F.3d at 145.  The same reasoning applies in the instant case as Plaintiff's counsel could have easily discovered Generations's federal status by either calling a government-sponsored toll-free number or entering

"Generations Family Health Center" into the Health Resources and Services Administration's website.

Additionally, the Second Circuit rejected the plaintiff's argument in *A.Q.C.* that it had no reason to suspect that Defendant was a federally funded clinic.  The Second Circuit rebuked this reasoning finding that "common sense – let alone years of experience in medical malpractice litigation – would alert a reasonable advocate to the possibility that a community health clinic with the professed mission of 'improv[ing] the health status of underserved communities' would be federally funded.  In fact, the statutory scheme at issue defines 'health center' for purposes of FTCA coverage in part as 'an entity that serves a population that is medically underserved.'" *Id.* (quoting 42 U.S.C. § 254b(a)(1)).  In the instant case, Plaintiff admits that the Generations's website indicated that it "received Health Care to the Homeless funding agency wide.  In addition, each site uses various resources to provide quality healthcare to homeless individuals."  [Dkt. #22, Ex. C, ¶26].   Plaintiff contends that an internet or "google" search for Health Care to Homeless "revealed that there are numerous private and state funded organizations nationwide providing aid for the homeless, but revealed no connection of such programs to the federal government or to federal funding." *Id.*  Although Plaintiff attempts to prove due diligence through this internet or "google" search, as the Second Circuit explained common sense, let alone years of experience in medical malpractice litigation as Pegalis had, would alert a reasonable advocate to the possibility that a health center that professes on its website that it "uses various resources to provide quality healthcare to homeless

individuals" might be federally funded.  As the Second Circuit explained, all Plaintiff's counsel had to do to discover the federal nature of Generations was to call a government-sponsored toll-free number or enter "Generations Family Health Center" into the Health Resources and Services Administration's website. The fact the Generations indicated on its website that it "uses various resources to provide quality healthcare to homeless individuals" that should have put a reasonably experienced advocate on alert that the defendant facility might be federally funded and subject to the FTCA.

Here, the facts and circumstances of the present case are more similar to *A.Q.C.* than *Santos*.  In fact, the Second Circuit in *A.Q.C.* commented that the Third Circuit's reasoning in *Santos* was "unavailing.  That decision rested on the perceived lack of publically available information that would have alerted the plaintiff that the allegedly negligent healthcare providers had been deemed federal employees.  Here, unlike, in *Santos*, the record identifies multiple publicly available sources of that information."  *A.Q.C.*, 656 F.3d at 146 n.7 (internal quotation marks, alterations and citations omitted).  In the present matter as was the case in *A.Q.C.* there were multiple publicly available sources of information that would have alerted an experienced medical malpractice firm like Pegalis that Generations was federally funded.

Moreover, the Decedent's family also displayed a lack of diligence in pursuing this matter.  Both Dr. Phillips and Mr. Deshong were well aware that the Decedent sought legal advice even before her death.  Dr. Phillips, who was a medical doctor himself, advised Attorney Nielsen of her death.  The Decedent's

son, Mr. Deshong, assumed responsibility for the affairs of her estate while admittedly unavailable to discharge them.   Mr. Deshong waited over three months from his mother's death to follow up with Attorney Nielsen regarding her claim.  Attorney Nielsen attested that that over the next eight months it was "impractical" to work with Mr. Deshong to attend to the legal details of his mother's estate.   In March 2010 almost a year following his mother's death, Mr. Deshong informed Attorney Nielsen that his uncle, Dr. Phillips, would be taking charge of his mother's estate.  Dr. Phillips then only got in touch with Attorney Nielsen three months later in July 2010.   It was only after July 2010 that the Decedent's family began in earnest to pursue the claim and attend to the Decedent's estate which was well over a year after the Decedent's death.  In light of these facts, this Court cannot find that the Decedent's family exercised due diligence.  It appears that retained counsel was hampered in its ability to represent the Decedent's interest by the her family particularly in light of the fact that under Connecticut law prior reasonable inquiry and a certificate of good faith including a signed opinion by a health care provider that there appears to be evidence of medical negligence must be obtained before filing a medical malpractice action.  See Conn. Gen. Stat. §52-190a.  Consequently, this Court finds that Plaintiff cannot establish the required due diligence and therefore equitable tolling cannot save Plaintiff's otherwise untimely complaint.

**Conclusion**

Based upon the above reasoning, the Defendant's [Dkt. #12] motion to dismiss is GRANTED without leave to file an administrative claim.  The Clerk is directed to close the case.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: August 17, 2012