UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHRISTOPHER PHILLIPS, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | |
| v. | : | 3:11-CV-1752-VLB |
| | : | |
| GENERATIONS FAMILY HEALTH | : | JULY 27, 2015 |
| CENTER, | : | |
| Defendant. | : | |

## MEMORANDUM OF DECISION DISMISSING PLAINTIFF'S ACTION ON SUMMARY JUDGMENT

Defendant Generations Family Health Center ("Generations") renews its motion to dismiss Plaintiff Christopher Phillips's medical malpractice action, which arises from the death of Phillips's sister, Nancy Cato, who died of colon cancer. The Court's previous dismissal for lack of subject matter jurisdiction was vacated and remanded by the Second Circuit. This Court then ordered the parties to brief the issues in light of the Second Circuit's opinion. The parties briefed the issues, supplying evidence outside the pleadings in support. Thereafter, the Supreme Court held that the statute of limitations found in the Federal Tort Claims Act ("FTCA") is not jurisdictional. With the parties' consent, the Court converted the motion to dismiss to a motion for summary judgment. For the following reasons, the Court now GRANTS summary judgment in Generations's favor and DISMISSES the action with prejudice.

## BACKGROUND

### I.    Procedural History Overview

On June 30, 2011, Phillips brought a medical malpractice action against Generations in the Connecticut Superior Court for the Judicial District of New London.   ECF, doc. 1 (Notice of Removal) at 5–21 (Compl.).   Generations, represented by the United States Attorney's Office, removed the case to federal court on the grounds that Generations "and its employees were acting within the scope of their federal employment as employees of the Public Health Service at the time of the incident out of which the Plaintiff's claim arose."   ECF, doc. 1 (Notice of Removal) at ¶ 3.   Generations moved to dismiss for lack of jurisdiction, arguing that Phillips did not exhaust his administrative remedies as required by the FTCA.   ECF, doc. 13 (Mem.).

The Court granted Generation's motion to dismiss, ruling that Phillips's claim accrued on April 27, 2009, that Phillips filed his action on June 30, 2011 even though the Connecticut Superior Court granted him an extension of the state statute of limitations, and that Phillips was not entitled to equitable tolling. *Phillips v. Generations Family Health Ctr. ("Phillips I")*, 2012 WL 3580532, *4–8 (D. Conn. Aug. 17, 2012).   Phillips appealed.   ECF, doc. 40.   In a summary order, the Second Circuit agreed that Phillips's claim accrued on April 27, 2009 and was commenced on June 30, 2011.   *Phillips v. Generations Family Health Ctr.*, 529 F. App'x 14, 17 (2d Cir. 2013).   However, in a published opinion, the Second Circuit vacated this Court's order with respect to its discussion on equitable tolling and remanded for consideration of "all of the relevant circumstances, including the

2

differences between this case and *A.Q.C.*,[1] in determining that Phillips's lawyers lacked diligence." *Phillips v. Generations Family Health Ctr. ("Phillips II")*, 723 F.3d 144, 155 (2d Cir. 2013).

After remand, this Court ordered the parties to file renewed briefing on Generation's motion to dismiss, addressing the issues raised by the Second Circuit's opinion and Section 526 of the Servicemembers Civil Relief Act ("SRCA"), 50 U.S.C. app. § 526 (2013).  ECF, doc. 46 (Text Order).  In addition to briefing the issues, the parties submitted evidence outside the pleadings.  With the parties' consent, the Court converted Generations's motion to dismiss into a motion for summary judgment.  ECF, docs. 64–66.

## II.    Relevant Facts

For the sake of efficiency, the Court will restate the relevant facts as presented in *Phillips I*, which were based on Plaintiff's complaint and memorandum in opposition to Defendant's motion to dismiss:

> Ms. Karen Cato (the "Decedent") was treated at Generations in Norwich, CT by Dr. Uzma Zaidi, Dr. Jyothirmayee Korivi, and APRN Tara Menichetti on several occasions from October 1999 through January 2009.  Plaintiff alleges that Defendant failed to timely diagnose and treat the Decedents' colon cancer.  Plaintiff further alleges that Defendant failed to order or prescribe a "screening colonoscopy for this patient in light of the patient's age, close family history of colon cancer, history of irritable bowel syndrome, blood in

---

[1] "*A.Q.C.*" refers to *A.Q.C. v. United States*, 656 F.3d 135 (2d Cir. 2011).

[2] The Court notes that Plaintiff does not define "FTCA Program."  The Court will assume for the purposes of this opinion that the term refers to cases in which a federally funded health center has been deemed to be a federal employee thus triggering the procedural requirements of the FTCA.

[3] The Court notes that searching PACER for "Generations Family Health

the stool and internal hemorrhoids, at office visits from September 17, 2007 until December 11, 2008." Plaintiff alleges that Defendant failed to screen for blood in the stool and conduct a simple rectal exam at office visits from September 17, 2007 until December 11, 2008. The Decedent passed away on April 6, 2009 of advanced colon cancer.

In January of 2009, prior to her death, Decedent consulted with Gerhardt M. Nielsen a lawyer with the law firm of Pegalis & Erikson, LLC ("Pegalis") regarding her diagnosis of advanced colon cancer. Attorney Nielsen indicated that he told the Decedent that "only after a review of her medical records by an expert would it be possible to advise if there was any reason to suspect that a physician did anything harmful to her" and that "in cases involving young people like her, it was very unlikely that any negligence of a doctor would have contributed to her injury because, in general, the standard of care for patient in her age did not require routine colon cancer screening." Attorney Nielsen sent a medical records request to Generations within a week of meeting with the Decedent in January of 2009 and told the Decedent that once the records were received he would have them reviewed by a medical expert.

Shortly following Decedent's death, the Plaintiff, Decedent's brother Dr. Christopher Phillips M.D., called Attorney Nielsen and informed him of her death. Dr. Phillips also indicated in this communication that the Decedent's son, Zane Deshong, would be in touch with Attorney Nielsen.  Dr. Phillips attests, in an affidavit, that he knew that the Decedent had spoken with lawyers at Pegalis prior to her death. Although the parties do not give the exact date that Dr. Phillips contacted Attorney Nielsen it is clear this communication occurred by April 27, 2009 as Attorney Nielsen attests that he was unable to review the medical records he received on April 27, 2009 as he "had no authority from any source to look at them as they were protected medical records."  The Court therefore assumes that April 27, 2009 is the date on which Dr. Phillips communicated to Attorney Nielsen regarding the Decedent's death.

On July 6, 2009, Attorney Nielsen received the promised phone call from Decedent's son, Mr. Deshong. Mr. Deshong informed Attorney Nielsen that he was "in the United States Navy on submarine duty in

the Pacific, and he specifically cautioned [Attorney Nielsen] that he would be very hard to contact because he would be on tour for months at a time." Attorney Nielsen told Mr. Deshong that his law firm Pegalis did not have all of Decedent's medical records and had not reviewed what records they had received because they did not represent Mr. Deshong or his mother's estate. Attorney Neilson encouraged Mr. Deshong to have someone appointed as administrator of his mother's estate so that someone could authorize Pegalis to investigate. *Id.* Mr. Deshong indicated that he did not object to Pegalis reviewing what records they had received.

Attorney Nielsen indicated that "[a]lthough, over the next eight months, we attempted to work with [Mr. Deshong] to attend to legal details, including ... the establishment of an estate, this became impractical." In March of 2010, Mr. Deshong advised Attorney Nielsen that he was sending his contact information to his uncle Dr. Phillips and that his uncle "would take care of the situation from that point forward" and would be in touch soon.

In July of 2010, [one year after Neilsen asked Mr. Deshong to have an executor named for his mother's estate,] Attorney Nielsen was contacted by Dr. Phillips who authorized Pegalis to review the Decedent's medical records. Attorney Nielsen put Dr. Phillips in touch with the DeAngelo firm a Connecticut law firm and advised him that DeAngelo would be working with Pegalis on this matter. "After July of 2010, Dr. Phillips was put in contact with Mr. DeAngelo's office for the purpose of having him appointed as the administrator of his sister's estate."

Attorney Nielsen sent the medical records they had received to Dr. Apstein, an internist and gastroenterologist to review. In December 2010, Dr. Apstein indicated that he had reviewed the available medical records but that he would prefer to review the complete record before giving his opinion. As of December 2010, Attorney Nielsen had not been able to request Decedent's medical records from Lawrence & Memorial as a result of the delay in appointing an administrator of the Decedent's estate. *Id.* On March 21, 2011, [more than two years after Neilsen asked Mr. Deshong to have an executor named for his mother's estate,] Dr. Phillips was appointed as administrator of the Decedent's estate by the Probate court.

*Phillips I*, 2012 WL 3580532, * 1–3 (internal citations omitted).

Moreover,

At the time of Karen Cato's death, there was no reason [for Pegalis] to suspect that any health care provider had harmed her in any way. And, at the time of her death, although we had sent for some of her medical records, [Pegalis] had received none of them except some irrelevant records (received Mid-March) from the University of Connecticut Medical Health Center in Farmington. So, as of April 6, 2009, when Karen Cato died, we at the Pegalis firm represented no-one [sic], had no client, no relevant medical records, and no authority to do anything.

ECF, doc. 22-1 (Exs.) at 11–22 (Nielson Aff.) at ¶ 8.

III.  <u>Second Circuit Opinion</u>

The *Phillips II* court observed that "courts should consider, as part of this case-by-case analysis, whether the plaintiff's lawyer had (or should have had) reason to suspect that the ostensibly private clinic might be a deemed federal employee" and accordingly instructed this Court to "consider all of the relevant facts and circumstances—including whether the plaintiff should have known to investigate the issue—to determine, utilizing its own discretion, whether the plaintiff and lawyer were sufficiently diligent."  723 F.3d at 153.  The *Phillips II* court cautioned that *A.Q.C.* decision does not dictate the outcome in this case as a matter of law and that this Court should "fully" consider whether there are material factual distinctions between *A.Q.C.* and the instant case.  *Id.* at 149. Specifically, the *Phillips II* court ordered this Court to consider the following on remand: (1) whether Pegalis had "previously encountered similar circumstances involving deemed federal employees"; (2) the fact that Generations's website "gave less of an indication that it received federal funding" than the website at

6

issue in *A.Q.C.*; (3) information regarding "how the HHS database and toll-free number operate, how they are publicized, and whether malpractice attorneys at the time would or should have known about their existence," i.e., was "Nielsen's lack of knowledge about the resources . . . reasonable or . . . a failure of diligence on his part"?; and (4) whether the fact that Pegalis "at least visited Generations's website, looked at its health records, and performed a corporate search," whereas Phillips's counsel in *A.Q.C.* did "literally nothing" to investigate whether defendant was in fact a federal actor, is an important factual distinction.  *Id.* at 148, 153–54.

## DISCUSSION

### I.   Equitable Tolling under the FTCA

The *Phillips II* court explicitly declined to reach the question of "whether FTCA's statute of limitation is jurisdictional and, hence, whether equitable tolling is ever available under the FTCA."  723 F.3d at 155 n. 8.  Instead, it left the question to this Court "to consider in the first instance on remand, if necessary, whether the FTCA's statute of limitations is jurisdictional."  *Id.* at 149. This Court need not consider that question because the Supreme Court has recently held that equitable tolling is available under the FTCA.  *United States v. Kwai Fun Wong*, 135 S.Ct. 1625, 1638 (2015) ("[W]e hold that the FTCA's time bars are nonjurisdictional and subject to equitable tolling.").  The parties have notified this Court of the change in the law, and Generations has withdrawn its argument that equitable tolling is unavailable under the FTCA, leaving only the question of whether equitable tolling is warranted.

"'To qualify for equitable tolling, the plaintiff must establish that

7

extraordinary circumstances prevented him from filing his claim on time, and that he acted with reasonable diligence throughout the period he seeks to toll.'" *Phillips II*, 723 F.3d at 150 (alterations omitted) (quoting *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)).   "The plaintiff must also show that his lawyers were reasonably diligent in determining 'the appropriate parties to sue, and what, if any, restrictions on the time and forum for bringing such a claim might exist.'" *Id.* (quoting *A.Q.C.*, 656 F.3d at 145).

### A. Pegalis's Expertise in Medical Malpractice Actions And Previous Experience with Federal Health Centers

Pegalis bills itself as a "Top Tier medical malpractice law firm on Long Island, New York State and Nationally."   ECF, doc. 49 (Generations Mem.) at 10 (citing http://www.pegalisanderickson.com/index.html).   Phillips does not dispute that Pegalis purports to specialize in medical malpractice actions but argues that the relevant question is whether the firm had prior experience with cases in which a health center had been deemed a federal entity.   ECF, doc. 52 (Phillips Mem.) at 14-20.

Generations argues that Phillips's counsel had prior experience with federally funded health centers that were deemed to be federal entities and was therefore on notice of the possibility that a health center could be deemed to be a federal entity.   ECF, doc. 49 at 11–12.   In support, Generations identifies another attorney in the Pegalis firm who, in April 2007, filed an action, *Sakif v. United States ("Sakif II")*, S.D.N.Y. 06-cv-2719, doc. 1 (Compl.), against a health clinic that was deemed to be a federal entity five years prior to this case.   *Id.*

This Court has also discovered an earlier case in which Pegalis had

experience with the exact issue raised by the facts of this case.   *See Sakif. v. Bronx Lebanon Hosp. Ctr. ("Sakif I")*, S.D.N.Y. 05-cv-7229, doc. 1 (Aug. 2005 Notice of Removal).   In *Sakif I*, the plaintiff was represented by Annamarie Bondi-Stoddard of Pegalis and that action was initially filed against the Bronx Lebanon Hospital Center in the Supreme Court of the State of New York, Bronx County.  *Id.* The *Sakis I* defendant, represented by the United States Attorney's Office in the Southern District of New York, removed the case to federal court, invoking the Public Health Service Act and deeming the Bronx-Lebanon Hospital Center and its employees to be federal employees.  *Id.*  The *Sakis I* defendant moved to dismiss the complaint, arguing that the *Sakis I* court lacked subject-matter jurisdiction because *Sakis I* plaintiffs failed to exhaust their administrative remedies under the FTCA before commencing the action.  *Id.*, doc. 3.  The parties then entered a stipulation of settlement and dismissal, in which the parties agreed that the United States should be substituted as a defendant in place of the Bronx Lebanon Health Center and its employees, and the plaintiffs indicated that they were pursuing administrative claims as required by the FTCA.  *Id.*, doc. 5. After pursuing that administrative claim, Pegalis filed *Sakif II*, the case cited and discussed by the parties in this action, in which the Sakif plaintiffs again filed suit in federal court and naming the United States as a defendant.  *Sakif II*, S.D.N.Y., 06-cv-2719, doc. 1 (Compl.).

Phillips argues that none of the individual attorneys representing him in

this case had experience with "FTCA Program"[2] cases and that the particular attorneys representing plaintiff had no knowledge of the *Sakif II* case cited by Generations.  ECF, doc. 52 at 19.  Attorney Nielsen does state that he also learned that his firm handled another case, *Reccio v. United States*, that included claims brought under the FTCA.  *Id.* at 18.  Nielsen does not specify whether *Reccio* involves a health center that has been deemed a federal entity.

Phillips's attempt to disclaim knowledge of the issue on the grounds that a different attorney in the Pegalis firm litigated the *Sakif* case is unpersuasive.  As a general matter, knowledge by one attorney in the firm is imputed to the other attorneys in the firm.  *See Hempstead Video, Inc. v. Inc. Village of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005) (observing that "[a]n attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences."); *Edwards v. Gould Paper Corp. Long Term Disability Plan*, 352 F.Supp.2d 376, 381 (E.D.N.Y. 2005) ("It is well settled that the knowledge of a single attorney within a firm is to be imputed to the entire firm."). Three facts make this principle particularly persuasive here.  First, Pegalis is not currently a large law firm, and there is nothing to indicate that it was a large law firm at the time plaintiff's complaint was filed.  According to the firm's website, there are nine attorneys at the firm, including Attorney Nielsen.  *See* About the

---

[2] The Court notes that Plaintiff does not define "FTCA Program." The Court will assume for the purposes of this opinion that the term refers to cases in which a federally funded health center has been deemed to be a federal employee thus triggering the procedural requirements of the FTCA.

Lawyers, www.pegalisanderickson.com/Partners-at-Pegalis-and-Erickson.php (last visited May 15, 2015).  The legal issue could have easily been shared among this small group of people.  Second, the law firm as a whole holds itself out as specializing in medical malpractice.  Prudence would dictate that a partner of a law firm touting itself as a top-tier-medical-malpractice-law firm would share with all of his partners his discovery of important legal issue with respect to medical malpractice.  Third, the firm learned about this issue after having made a mistake, a circumstance which would not only be memorable but also necessitate disclosure to colleagues.

Further, the relevant precedent does not ask whether the specific attorney had personal experience but whether "the plaintiff's *law firm* knew from personal experience that 'ostensibly private doctors' could turn out to be deemed federal employees and, therefore, had been put on notice that inquiring about a health provider's federal status might be necessary." *Phillips II*, 723 F.3d at 152 (emphasis added) (quoting *A.Q.C.*, 656 F.3d at 146); *see also A.Q.C.*, 656 F.3d at 145 ("On at least two prior occasions, the United States removed to federal court medical malpractice claims against persons deemed federal employees that *the Firm* had improvidently filed in state court." (emphasis added)).

Because the law firm representing Phillips had previous experience with a health center that had been deemed a federal employee, Phillips's counsel has demonstrated the same lack of diligence that the Second Circuit found in *A.Q.C.* As the Second Circuit wrote in *A.Q.C.*:

> It is hard to understand why any lawyer — let alone a lawyer at a firm specializing in medical malpractice with specific prior acquaintance

with this issue — would not investigate the federal nature of potential defendants as part of standard due diligence in every medical malpractice case. Having neglected to take that simple step, the Firm cannot now argue that it diligently pursued this claim on [plaintiff's] behalf.

656 F.3d at 145.

Generations also argues that lack of experience is no excuse for a lack of diligence because the ethical rules governing attorneys in both Connecticut and New York allow attorneys to take on cases even if they lack experience in the subject matter of a particular case.  ECF, doc. 49 at 13.  Because the Court finds that the law firm representing Phillips had experience with this type of case, this argument is inapplicable, and the Court declines to consider it.

### B.  Previous Litigation Involving Generations

Generations argues that "[a] quick search" would have revealed that it is a deemed federal facility subject to the FTCA.  *Id.* at 24.  Philips does not respond to this argument. The Court's own Westlaw search reveals four opinions including the name "Generations Family Health Center" in the party name field. Three are from this litigation.  The fourth, *Montanez ex. rel. Rosario v. Hartford Healthcare Corp.*, 2003 WL 22389355 (D. Conn. Oct. 17, 2003), is cited by Generations and explicitly discusses Generations's status as a deemed federal facility.  The Court's PACER search of Second Circuit cases including the party name "Generations Family Health"[3] reveals additional cases predating this

---

[3] The Court notes that searching PACER for "Generations Family Health Center" yields only one result, the case currently before the court.

lawsuit in which Generations was represented by the United States Attorney's Office.  *See, e.g.*, *Schlehofer v. United States*, D. Conn. 07-cv-217, doc. 11 (June 2007 Order substituting United States as party); *Audet v. Cumming*, D. Conn. 01-cv-1380, doc. 8 (Aug. 2001 Stipulation by Raymond C. Audet, Roxanne J. Cumming, Generations Health to Substitute Parties with USA, for Voluntary Dismissal of action without prejudice).

### C. Generations's Website

Generations argues that, even without explicit disclosure of its deemed federal status,[4] information found on Generations's website during the relevant period was sufficient to put Phillips on notice that Generations was a deemed federal entity.  ECF, doc. 49 at 15-19.  Phillips takes the opposite position.

### 1.  Healthcare to the Homeless Disclosure

Generations argues that the following statements regarding healthcare services provided to the homeless that appeared on its website during the relevant period were sufficient to put plaintiff on notice that Generations received federal funding: "In addition, each site uses various resources to provide quality healthcare to homeless individuals . . . . 'Generations Family Health Center receives Health Care to the Homeless (HCH) funding agency wide.'"  *Id.* at 15-16 (quoting Generations's website).

---

[4] As of the date of this opinion, Generations's website discloses in fine print at the bottom of each page that "[t]his health center is a Health Center Program grantee under 42 U.S.C. 254b, and a deemed Public Health Service employee under 42 U.S.C. 233(g)-(n)." www.genhealth.org, last visited May 17, 2015. The Court is unaware of when this text was added to the website.

Generations argues that Phillips should have researched the HCH program and that such research would have lead him to the website of the United States Department of Health and Human Services ("HHS"), which indicated, during the relevant period, that:

> Health Care for the Homeless Program is a major source of care for homeless persons in the United States, serving patients that live on the street, in shelters, or in transitional housing. *In 2008, HRSA-funded health centers served nearly 934,000 persons experiencing homelessness.*

*Id.* at 18.

Phillips does not dispute that, at the relevant time, Generations's website disclosed that it "receive[d] Health Care to the Homeless (HCH) funding agency wide." ECF, doc. 52 at 11. Instead, he argues that the information provided on Generations's website was insufficient to trigger a duty for him to investigate whether Generations was a deemed federal entity. *Id.* at 8–14.

Generation's argument regarding the reference to HCH funding is unpersuasive. Pegalis's review of Generations's website revealed only that Generations was a private healthcare provider that provided services to the homeless. This description did not necessarily alert Pegalis to the fact that Generations was federally funded because numerous state and private organizations fund healthcare for the homeless and the Generations website did not disclose that it received federal funds. Further, Generations did not describe its core mission as providing healthcare to underserved persons. Moreover, it identified itself as a private nongovernmental agency. The reference to HCH therefore gave Nielsen little reason to suspect that Generations received federal

funding and that its physicians were federal employees.   Nothing in the name "Healthcare to the Homeless" suggests that it is a federal program.   Additionally, the Second Circuit found that "[e]vidence that Generations helped homeless individuals as one small part of its larger mission hardly leaves one with a clear impression that the clinic might be a federal entity." 723 F.3d at 154 (citing *Santos v. United States*, 559 F.3d 189, 201 (3d Cir. 2009)).

2.   "Health Center"

Generations also argues that the term "health center" should have alerted Phillips's counsel to the possibility that Generations received federal funding because the description of Generations provided on its website matches the definition of "health center" found in the relevant section of the United States Code.   ECF, doc. 49 at 19.   Generations argues that if one reads the definition of health center found in section 254b(a) in conjunction with section 254b(h), which authorizes the Secretary of the HHS to award grants to provide services to the homeless, one should arrive at the conclusion that the term "health center" indicates that an entity receives federal funds.  *Id.*

This Court is not convinced that use of the term "health center" places a plaintiff on notice that a defendant clinic may be deemed to be a federal entity. Rather, the Court finds that the statutory definition of health center is relevant only when an attorney is aware that a defendant may be deemed to be a federal entity, as Phillip's counsel was here.   When counsel is aware that a health center could be deemed a federal entity, counsel can consult the section of the code that authorizes entities to be deemed federal employees, 42 U.S.C. § 233(g).   Section 233(g) explicitly refers to the statutory definition of health center where it says "a

15

public or non-profit private entity receiving Federal funds under section 330 [42 USCS § 254b]." 42 U.S.C. § 233(g)(4).  The definition of health center is found in section 330, codified at 42 U.S.C. § 254b, and includes "an entity that serves a population that is medically underserved, or a special medically underserved population comprised of migratory and seasonal agricultural workers, the homeless, and residents of public housing." 42 U.S.C. § 254b.  The Court does not find that there is a per se rule requiring an attorney to assume that a health center is a deemed federal entity whenever that health center advertises that it serves a medically underserved community or the homeless. This information is just another clue for a diligent law firm possessing prior experience with this scenario to consider when determining whether a health center may be a federal entity.

The Court finds that there was little in the Generations website which would have alerted Pegalis to the need to call the hotline or enter Generations's name into the online database maintained by HHS.  In addition, Generations's website made Generations appear to be a private concern. Given Generations's description of its mission and status on its website, Nielsen would have had little reason to suspect that Generations was federally funded, had it not been for his firm's previous noteworthy experience with health centers that had been deemed federal entities.

### D.  HHS Database and Toll-Free Hotline

The parties do not dispute that resources existed during the relevant time enabling a party to determine whether a health center had been deemed a federal

entity.  Generations submits a September 26, 2011 declaration from Suma Nair, the Director of the Office of Quality and Data within the Bureau of Primary Health Care of the Health Resources and Services Administration.  ECF, doc. 49-3.  This declaration was originally submitted as evidence in a similar lawsuit in the United States District Court for the Middle District of Florida, and Generations has submitted the same declaration as an exhibit in this action.  *Id.*  Ms. Nair declares under penalty of perjury that "[a]t all relevant times hereto, HRSA/BPHC maintained the FTCA HelpLine, a toll-free number (1-866-FTCA-HELP) and a website (http://findahealthcenter.hrsa.gov) to answer inquiries from members of the general public regarding a health center's federally deemed status" and that "the HelpLine remained continuously in effect since August 2001.  *Id.* at ¶ 6.

Generations also submits Ms. Nair's May 8, 2012 deposition transcript from the Florida action.  ECF, doc. 49-4.  Ms. Nair testified as follows.  The phone number for the hotline was changed in August of 2010.  *Id.* at 52:14–53:13.  Calls to the previous number were routed to the new number for an undisclosed amount of time.  *Id.*  After the rerouting ceased, there was then a voice mail message on the old line informing callers of the new line, which remained for an undisclosed amount of time.  *Id.*  The transition to a new number was also "shared through a listserv announcement as well as prominently displayed on our FTCA Web site."  *Id.*  It is thus clear that during the relevant time the hotline existed and could have been found and utilized by a diligent attorney.

Ms. Nair deposition further indicates that, for the years 2008, 2009, and 2010, there was apparently no database devoted exclusively to searching for

deemed federal entities. *Id.* at 50:15–22. Rather, the government provided a database where the public could search for all Public Health Service Act funded community health centers. *Id.* The health centers that are deemed federal entities are a subset of that larger pool. *Id.* at 50:23–25. Although Ms. Nair's deposition does not cover the period after 2010 and speaks only generally about "2010" without providing specific dates therein, it appears clear that there was not a database devoted exclusively to deemed federal entities for all of 2009 and at least part of 2010. *See id.* at 51:17–52:4. However, there is no question that there existed a telephone hotline during the entire period in question.

Phillips does not challenge the existence of resources at the relevant time by which a person could have determined whether a health center was a deemed federal entity. ECF, doc. 52 at 21–28. Instead, he argues that the resources were insufficiently publicized and that his counsel had no knowledge of these resources. *Id.* Phillips cites to a portion of Ms. Nair's deposition in which she concedes that the existence of the hotline and database is not publicized beyond the HRSA website:

> Q. Okay. And with regard to the HRSA Web site and the FTCA help line, what was it that HRSA was doing to publicize the existence of those two resources to the general public?
> A. They were available on our Web site.
> Q. Okay. They made them available online?
> A. Correct.
> Q. Any other efforts made by HRSA of which you're aware to publicize the existence of those resources to the general public?
> A. No.

*Id.* at 23–24 (citing ECF, doc. 49-4 at 59:16–60:1).

Phillips's has also submitted declarations from both Attorney DeAngelo

and Attorney Nielsen, in which they both declare that they were unaware of either the toll-free hotline or the HRSA database prior to this lawsuit.  ECF, docs. 52-6 (DeAngelo Aff.) at ¶ 6; 52-7 (Nielsen Decl.) at ¶ 7.  Generations does not argue that the resources were well publicized and instead argues that the failure of Phillips's counsel to discover these resources is another example of their lack of diligence.  Phillips argues that this case can be distinguished from *A.Q.C.* on the grounds that the plaintiff's lawyer in *A.Q.C.* conceded having knowledge of the toll-free hotline.  ECF, doc. 52 at 15–16; *see also Phillips II*, 723 F.3d at 155 ("The law firm in *A.Q.C.* clearly knew about the government's hotline because it called the toll-free number once it finally decided to investigate the defendant's federal status.").

It is therefore undisputed that the toll-free hotline and the HRSA database were not well publicized and that Phillips's counsel was unaware of these resources.  If not for the fact that the Pegalis firm had noteworthy experience with this exact scenario, this would weigh in Phillips's favor.  The law firm's experience, however, put counsel on notice that a health center could be a deemed federal entity, and, as a result, counsel should have taken the steps to identify and utilize the available resources in order to avoid this scenario. The Government's failure to publicize the hotline and the database thus does not merit equitable tolling in this case.

### E.  Comparison with *A.Q.C. and* Santos

The Court does not treat *A.Q.C.* as creating a per se rule governing the outcome of this case.  It nonetheless finds *A.Q.C.* highly persuasive because

counsel in that case behaved similarly to counsel here.  Phillips attempts to distinguish *A.Q.C.* by arguing that his counsel "exhibited more diligence" than plaintiff's counsel in *A.Q.C.* because Phillips's counsel visited Generations's website, reviewed medical records, and had a paralegal perform a corporate records search.  ECF, doc. 52 at 5–6.  However, that argument disregards the fact that the *A.Q.C.* court found that plaintiff's counsel did "literally nothing . . . to determine whether Dr. Castillo was a federally-deemed employee during the two years following the accrual of plaintiff's claims."  656 F.3d at 144.  The *A.Q.C.* court was considering the fact that plaintiff's counsel, despite being on notice that a defendant may be deemed a federal entity, did nothing to determine whether the defendant in that action was a federal entity.   The *A.Q.C.* court reasoned:

> It is hard to understand why any lawyer — let alone a lawyer at a firm specializing in medical malpractice with specific prior acquaintance with this issue — would not investigate the federal nature of potential defendants as part of standard due diligence in every medical malpractice case.  Having neglected to take that simple step, the Firm cannot now argue that it diligently pursued this claim on A.Q.C.'s behalf.

656 F.3d at 145.

Pegalis may have done something, but that something wasn't enough, particularly in light of its prior experience with this issue.  Its inquiry failed to satisfy its duty of due diligence because it was both cursory and misdirected.  It merely conducted a corporate and medical records search.  These inquiries alone were unlikely to reveal Generation's funding sources. The Court cannot conclude that Pegalis was appreciably more diligent than the law firm in *A.C.Q.*  This is

buttressed by the nature of Pegalis's earlier noteworthy experience with this issue.  Not only did Pelagis misfile *Sakif I*, withdraw the action upon learning of its mistake, and imitate an administrative proceeding before filing *Sakif II*, it ran the risk of failing to file an action in the proper forum before the expiration of the statute of limitations because of the mistake.   Having had that experience once, determining whether a healthcare provided was a deemed federal employee should have been a standard part of the medical malpractice law firm's due diligence and its due diligence should have been specifically tailored to elicit the information required to make that determination.

Phillips also attempts to distinguish *A.Q.C.* by arguing that in *A.Q.C.* the defendant's website disclosed that it was a "Federally Qualified Section 330 Community Health Center." ECF, doc. 52 at 15.   Phillips points out that the Government argued in its *A.Q.C.* briefing that the website disclosed that the defendant was a "Federally Qualified Section 330 Community Health Center." ECF, doc. 54-4 at 4.  Although that is more disclosure than was available on Generations's website at the relevant time, such disclosure is insufficient to distinguish *A.Q.C.* from the instant case.  First, the disclosure that a health center is a "Federally Qualified Section 330 Community Health Center" is not the same as disclosing that a health center has been deemed a federal entity.  As noted above, not all federally qualified health centers are deemed to be federal entities.  Additionally, the Second Circuit did not rely on the website disclosures in its opinion in *A.Q.C.*  Instead, the *A.Q.C.* court found that the plaintiff's counsel lacked diligence because it had "specific prior acquaintance with this issue" and

failed to investigate the federal nature of the potential defendants.

Finally, Phillips asks this court to rely on the Third Circuit's decision in *Santos v. United States*, 559 F.3d 189 (3d Cir. 2009), in which that court held that the statute of limitations should be equitably tolled. He argues that *Santos* is "virtually indistinguishable from the case at bar." ECF, doc. 52 at 4. But that's not true. There is no indication that the counsel in *Santos* had prior experience with a deemed federal entity that put them on notice of the need to inquire into a clinic's federal status. Further, in *Santos*, "the Government [did] not identif[y], at least to [the court], any publicly available sources of information from which Santos could have learned this critical fact or, even if the information had been available, what circumstances should have led her to inquire into York Health's federal status for purposes of the FTCA." 559 F.3d at 203. Here, Generation's has shown that the Government had a publicly available hotline and database and that Generations's deemed status was clear from a quick check of PACER or Westlaw. Further, Pegalis's experience with this situation demonstrates "circumstances [which] should have led [plaintiff] to inquire into [defendant's] federal status for purposes of the FTCA." The Court thus declines to rely on *Santos* in this case.

## II.   LACK OF DILIGENCE BY PHILLIPS AND HIS FAMILY

The *Phillips II* court explicitly disagreed with this Court's previous finding that Phillips and his family demonstrated a lack of diligence:

> The district court found that, even if Pegalis sufficiently investigated the claim, Phillips and his family still demonstrated a lack of diligence because they did not begin to pursue the claim "in earnest" until July of 2010, over a year after Cato's death. However, the

22

government has forfeited this issue by failing to raise it on appeal and, in any event, we disagree with the district court. The plaintiff and his lawyers faced a number of challenges posed by Deshong's overseas military service and still filed the lawsuit within the Connecticut statute of limitations, which they thought was the relevant deadline.

*Phillips II*, 723 F.3d at 156 n.2 (internal citation omitted).  Generations has not argued in its renewed briefing that Phillips and his family themselves lacked diligence.  Thus, it appears that the only issue disputed by the parties upon the renewed briefing is that of the diligence of Phillip's counsel. This Court respectfully disagrees with the finding that Phillips was diligent.

Extraordinary circumstances did not prevent Phillips from timely filing a claim.  For reasons not apparent from the record, Cato, Deshong, and Phillips simply failed to pursue the matter, truncating the time that Pegalis had to secure her medical records from her various healthcare providers, determine whether she might have a viable medical malpractice claim, secure a good faith letter from an oncologist as required by Connecticut law, and investigate Generations's status.

First, in January of 2009, Cato consulted with Attorney Nielsen to determine whether she had a viable medical malpractice claim against her doctor for failure to diagnose her colon cancer.  ECF, doc. 22-1 (Exs.) at 11–22 (Nielson Aff.) at ¶¶ 3–4.  Attorney Nielsen advised Cato that "only after a review of her medical records by an expert would it be possible to advise if there was any reason to suspect that a physician did anything harmful to her," but that "in cases involving young people like her, it was very unlikely that any negligence of

a doctor would have contributed to her injury because, in general, the standard of care for patient of her age did not require routine colon cancer screening." *Id.* at ¶ 5. Thereafter, Cato did not diligently pursue a claim: she did not provide the firm with a clear medical history or her medical records; and Cato did not sign a release or an authorization for Nielsen to obtain and review her medical records. *Id.* at ¶ 8.

Phillips was aware that the firm had been consulted before and following Cato's demise on April 6, 2009, but he did not provide this information either. ECF, doc. 22-1 (Ex. B) at ¶5. Dr. Phillips did not assume responsibility for creating or administering an estate for Cato. Instead, he informed Nielsen that Cato's 22-year-old son Zane Deshong would be in touch with the firm. *Id.* at ¶¶ 7, 10. Phillips did not intercede during Deshong's deployment.

The first time Deshong contacted Nielsen was three months later on July 6, 2009. *Id.* at ¶¶ 10–11. During that conversation, Nielsen informed Deshong that if he wanted the firm to investigate whether there was a viable medical malpractice claim Deshong needed to create an estate for Cato and provide the firm with her medical records and authorizations. *Id.* On July 16, 2009, Deshong informed Nielsen that he would be deployed on a submarine after July 20, 2009 and would be inaccessible. *Id.* at ¶ 12. Deshong did not transfer responsibility for pursuing the claim despite knowing that he had not done so for approximately three months and that he would be inaccessible during his deployment. He could have transferred responsibility to Phillips as he did months later. There is nothing in the record to suggest that Deshone did anything in furtherance of Cato's

24

potential medical malpractice claim from July 6 to July 20, 2009.  Over the next eight months, Pegalis attempted to work with Deshong to no avail.  *Id.* at ¶ 13. Although Deshong was honorably discharged, in November 2009—four months after his deployment during which he was inaccessible—Deshong never established an estate for Cato or provided Nielsen with any of the information which Nielson told him the firm needed in order to determine whether Cato had a viable medical malpractice claim.  It was not until four months after his honorable discharge from the military in March of 2010 that Deshong contacted Nielsen.  *Id.*; *see also* ECF, doc. at 30 n.9.  During their third conversation in March of 2010 Deshong advised Attorney Nielsen that Phillips "would take care of the situation from that point forward" and would be in touch soon.  *Id.* at ¶ 14.  Although Deshong knew that he had to provide Nielsen with certain information in order for the firm to determine whether Cato had a viable medical malpractice claim, he inexplicably failed to do so.

While a serviceperson's deployment and resulting inaccessibility would ordinarily be an extraordinary circumstance, it is not here.  First, Cato had two adult decedents capable of assuming responsibility for creating and administering her estate.  Deshong assumed responsibility knowing that he would be deployed.  He did not transfer responsibility to his uncle when he knew he was going to be deployed.  He was deployed for at most four months. Finally, he did not transfer responsibility for the matter until four months after his discharge.

Because of the collective inaction of Cato, Deshong and Nielsen, Cato's

potential claim languished for an entire year.  It is not unreasonable to infer that their inaction was intentional because Nielsen had advised Cato that administration of the diagnostic test, which would have detected Cato's cancer, was not the standard of care for a woman her age and therefore the viability of a medical malpractice claim was known by her to be unlikely.  In this Court's view, the record does not reflect that Cato and her family did not act diligently.

III.    Servicemembers Civil Relief Act

As noted above, the Court ordered the parties to brief the applicability of the SCRA because Phillips alleged that Deshong was a servicemember on active duty for several months during the relevant period.  ECF, doc. 46.  The relevant portion of the SCRA provides that:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the servicemember or the servicemember's heirs, executors, administrators, or assigns.

50 U.S.C. app. § 526(a).

Generations argues that the SCRA does not apply to this action because the claim neither belongs to Deshong nor was brought by him: the claim belongs to the estate of the decedent and was brought by the executor of the decedent's estate.  ECF, doc. 49 at 25–27.  Phillips argues that the SCRA applies to the time when Deshong was the executor of the estate.  ECF, doc. 52 at 29–30.

Here, the cause of action belongs to the estate of the decedent, Nancy Cato.  *See* **Conn Gen. Stat. § 52-555**; *Sanderson v. Steve Snyder Enters., Inc.*, 196

Conn. 134, 149 (1985) ("Under our wrongful death statute, the statutory right of action belongs, in effect, to the decedent, and to the decedent alone, and damages are recoverable for the death . . . as for one of the consequences of the wrong inflicted upon the decedent." (internal quotation marks omitted)).  Phillips, on behalf of the estate of Nancy Cato, brought only a one-count action for negligence.  This is a claim belongs to the estate of Nancy Cato rather than Phillips.  *Cf. Stutz v. Guardian Cab Co.*, 273 A.D. 4 (1st Dep't 1947).  In *Stutz*, the plaintiff servicemember brought two claims as administrator of his mother's estate following her death in a traffic accident, one for wrongful death and one for personal injury.  The *Stutz* court applied the New York state analog to the federal SCRA (then called the "Soldiers' and Sailors' Civil Relief Act") to plaintiff soldier's wrongful death claim because "[e]ssentially the action is a suit for injury to the property rights of the beneficiaries named in the statute."  *Id.* at 7.  However, the *Stutz* court declined to apply the statute to plaintiff's personal injury claims because "[t]he rights sought to be enforced on this cause of action are primarily those of the decedent, who was never in the military service."  *Id.* at 10.

This Court also finds persuasive the case of *Lopez v. Waldrum Estate*, 460 S.W.2d 61 (Ark. 1970), in which the plaintiff servicemember brought an action arising from an automobile accident in which his wife and daughter were injured. The *Lopez* plaintiff argued that the Soldiers' and Sailors' Relief act tolled the statute of limitations for his claims.  *Id.* at 63.  The Arkansas Supreme Court held that the statute did not toll the claims that the servicemember brought on behalf of his wife because the claims belonged to her and she could have brought them

herself.  *Id.* at 63–64.  The Court made the same ruling as to the claims of the minor child, ruling that the claims belonged to the child when they were for "pain and suffering, personal disfigurement, inability to attend school, future medical expenses reasonably certain to be required after his majority, and probable loss of earnings and earning capacity after majority."  *Id.* at 64.  Because the claims belong to the child, they could have been brought by the child's mother or by a third person as next friend or duly appointed guardian.  *Id.* The *Lopez* court held that the statute tolled the limitations period only for those claims that were personal to the servicemember, including claims for "loss of services, society, companionship and marriage relationship, and medical expenses incurred and for which he is, or may become, liable."  *Id.* at 65.  Particularly persuasive is the *Lopez* court's ruling that "[w]here there were competent persons by whom an action was or could have been brought as easily as it could have been by the person in military service, it has been held that the section does not apply, particularly when the suit is brought in a representative capacity."  *Id.* at 63; *see also McCoy v. Atlantic C.L.R. Co.*, 47 S.E.2d 532, 535 (N.C. 1948) (declining to toll the limitations period for a wrongful death claim brought by a servicemember and noting that "there were two sons and a daughter, and probably other relatives, in a position to know of the occurrence on which an action might be founded, certainly eligible for appointment to the administration").

Phillips argues that the SCRA would apply if Deshong had remained the executor of the estate and had filed the action himself.  However, he cites no authority to support this argument, and the argument is counter to the precedent

discussed above.  In this case, the claims belonged to Cato's estate and were not personal to Deshong, as is demonstrated by the fact that the action was ultimately filed by Phillips.  Because the claims belonged to Cato and her estate, and because there was a nonservicemember plaintiff who could have filed the claims at any time during the relevant period, the Court declines to apply the SCRA to toll the limitations period in this action.

<u>CONCLUSION</u>

The FTCA's statute of limitations may be equitably tolled, but equitable tolling does not apply here because, despite having prior experience with this exact scenario, Phillips's counsel did not diligently investigate the federally deemed status of Generations.  The failure of Cato's survivors to diligently pursue a medical malpractice claim offers some explanation for counsel's lack of diligence.  Even so, during the truncated time period left by the decedent and her family's unexplained inaction, counsel failed to act diligently in light of counsel's familiarity with the issue and the wealth of publicly available information that would have identified Generations as a deemed federal entity.   Accordingly, the Court GRANTS summary judgment in Generations's favor and DISMISSES the action with prejudice.  The Clerk is directed to entered a separate judgment and close this file.

IT IS SO ORDERED.

_____
/s/
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: July 27, 2015